**UNITED STATES of America**

v.

**Muhammad ASKARI, Appellant.**

No. 95–1662.

United States Court of Appeals,
Third Circuit.

Submitted Pursuant to Third Circuit
LAR 34.1(a) Nov. 6, 1996.

Argued En Banc Oct. 29, 1997.

Decided April 8, 1998.

David L. McColgin, Robert Epstein (Argued), Defender Ass'n of Philadelphia, Federal Court Division, Philadelphia, PA, for Appellant.

Stephen J. Britt (Argued), Office of U.S. Atty., Philadelphia, PA, for Appellee.

---

\* Judge Sloviter was Chief Judge of the Court of Appeals for the Third Circuit at the time this appeal was argued. Judge Sloviter completed her term as Chief Judge on January 31, 1998.

Before: BECKER, *Chief Judge;* SLOVITER,\* STAPLETON, MANSMANN, GREENBERG, SCIRICA, COWEN, NYGAARD, ALITO, ROTH, LEWIS, McKEE, and GARTH, Circuit Judges.

## OPINION OF THE COURT

SCIRICA, Circuit Judge.

This case involves an interpretation of the sentencing guidelines. The issue on appeal before the *en banc* court is the continuing vitality of our opinion in *United States v. Rosen,* 896 F.2d 789 (3d Cir.1990), addressing § 5K2.13 of the United States Sentencing Commission, *Guidelines Manual* (Nov.1997) which permits a downward departure based on diminished capacity where the crime is nonviolent. The specific issue requires us to examine the meaning of "non-violent" offense under the sentencing guidelines.

Although resolution of this case would not necessarily compel reexamination of *Rosen,* much has been written by other courts of appeals since our decision eight years ago. The *en banc* court affords us the opportunity to revisit the issue and modify our views.

### I.

### A.

Muhammad Askari appeals his sentence for bank robbery under 18 U.S.C.A. § 2113(a) (West Supp.1997), contending the district court should have granted him a downward departure for diminished capacity under USSG § 5K2.13 because (1) the unarmed bank robbery was nonviolent and (2) he has a well-documented history of serious psychiatric illness.

Askari's mental illness at the time he committed the bank robbery is not at issue. Indeed, before sentencing, the district court found that Askari was not mentally competent and committed him, under 18 U.S.C. § 4244(d), to a federal institution for psychiatric care and treatment.[1] After the warden

---

1. Dr. Edward Guy examined Askari to assess whether he was competent to stand trial. Dr. Guy initially concluded that Askari was suffering from paranoid schizophrenia in partial remission, drug addiction, and seizure disorder, but he

at the U.S. Medical Center for Federal Prisoners at Springfield, Missouri certified that Askari had recovered and was again mentally competent, the court sentenced him to 210 months in prison. (*See* App. at 58a, 68a).[2]

The facts regarding the bank robbery are not in dispute. On the afternoon of April 23, 1992, Askari entered the First Bank of Philadelphia at 1424 Walnut Street in Philadelphia. He approached a closed teller's window and said two or three times, "Put the money on the counter." Then, he went to an open window and told the bank teller, Ellen Ishizaki, "You have three seconds to give me the money." After Ishizaki gave him bait money, he ran out the door. Askari was not seen carrying a weapon, nor did he use force or make specific verbal threats of harm. When he demanded money from bank teller Ishizaki, however, he had his hand underneath his shirt. Two bank employees along with a Center City Special District employee chased Askari and caught him two blocks away. Police later found the bait money in Askari's pants. They did not recover a weapon. (*See* Presentence Report ¶¶ 5–8).

Askari was indicted for bank robbery, and, on July 10, 1992, was found guilty by a jury. At sentencing, defense counsel argued for a downward departure based on Askari's diminished mental capacity, citing his history of serious psychiatric illness and his diagnosis as a paranoid schizophrenic. The district court declined to grant the departure, ex-

plaining that the sentencing guidelines "contain a policy statement that a downward departure for diminished capacity is limited to non[-]violent offenses .... [the] commission says [there is] no downward departure for diminished capacity at the time of the offense, if the offense is a violent crime." (App. at 45a). The court also rejected defendant's motion for downward departure based on unusual, mitigating circumstances not adequately considered by the guidelines.[3]

**B.**

Askari appealed his sentence, contending the unarmed bank robbery was a non-violent offense because he did not use force or violence, or verbally threaten or harm anyone during the robbery. A panel of our court rejected Askari's arguments and affirmed the district court:

> In *United States v. Rosen*, 896 F.2d 789, 791 (3d Cir.1990), we held that the district court did not have the authority in a bank robbery sentence to depart downward because that offense is not a 'non-violent' offense. We so concluded by looking to a separate guidelines provision, [USSG] § 4B1.2, which defines robbery as a 'crime of violence.' Although the circuits are split on this point, we are bound by our prior holding.

*United States v. Askari,* No. 95–1662, 1997 WL 92051, at *2 (3d Cir. Mar. 5, 1997), *Order*

concluded that Askari was competent to stand trial. Following a second psychiatric evaluation before Askari's sentencing, Dr. Guy testified that Askari was not competent. Noting Askari's "history of serious mental illness," Dr. Guy found that Askari was too delusional to be able to cooperate with his attorney. The district court then ordered Askari's commitment. After two years of treatment at the U.S. Medical Center for Federal Prisoners in Springfield, Missouri, Askari was diagnosed as suffering from "Schizophrenia, Paranoid Type currently in remission with antipsychotic medication." The report noted that Askari initially "exhibited delusional thinking and auditory hallucinations," which improved with medication. The report concluded that Askari was now competent. (*See* App. at 62a–67a, 68a).

**2.** Askari qualified as "a career offender in that he was at least 18 years old at the time of the instant offense, the instant offense [was] a felony involv-

ing violence and the defendant [had] at least two prior felony convictions for crimes of violence." Presentence Report ¶ 33. (*See* App. at 56a (district court noting, during sentencing, Askari "has a long history of crime including violent crime .... the criminal history score in this case takes him pretty much to the top of the range" but concluding "[b]ecause I am satisfied that the low end of the sentencing range will provide a sufficient deterrent and punishment I am going to sentence him at the bottom of the range with the discretion I have")).

**3.** *See* USSG § 5K2.0, p.s. (permitting the imposition of a sentence outside the range established by the guideline "if the court finds 'that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence different from that described' ").

*Vacating Opinion and Granting Rehearing En Banc,* Mar. 27, 1997.

Nonetheless, we recognized disagreement among the courts of appeals whether the "crime of violence" definition contained in USSG § 4B1.2[4] governs the "non-violent" offense requirement of USSG § 5K2.13:

> Four other circuits have reached the same conclusion that this court reached in *Rosen.* *United States v. Mayotte,* 76 F.3d 887, 889 (8th Cir.1996); *United States v. Poff,* 926 F.2d 588, 591–93 (7th Cir.1991) (*en banc*) (6–5 decision); *United States v. Maddalena,* 893 F.2d 815, 819 (6th Cir. 1989); *United States v. Borrayo,* 898 F.2d 91, 94 (9th Cir.1989). However, two circuits, following Judge Easterbrook's dissent in *Poff,* have concluded that the "non-violent offense" requirement of § 5K2.13 is not governed by the "crime of violence" definition contained in § 4B1.2. *United States v. Weddle,* 30 F.3d 532, 540 (4th Cir.1994); *United States v. Chatman,* 986 F.2d 1446, 1450 (D.C.Cir.1993).

*Askari,* 1997 WL 92051, at *2 n. 2.

In a concurring opinion, Judge Becker, recognizing our controlling precedent in *Rosen,* suggested "that our decision in *Rosen,* that a downward departure is not available under § 5K2.13 of the sentencing guidelines in relation to a crime, the commission of which involves no violence in fact, is incorrect and should be reconsidered by the Court *en banc.*" *Askari,* 1997 WL 92051, at *2 (Becker, J., concurring). According to Judge Becker:

> While 'crimes of violence' and 'non-violent offense' employ the same root word, the phrases 'readily may take meanings other than as opposites.' More importantly, the distinct objectives of the two provisions at issue—§ 4B1.2 and § 5K2.13—counsel

that the meaning of the former not govern that of the latter.

\* \* \* \* \* \*

In short, some factors at work in the departure sections of the Guidelines are in tension with those at work under the career offender sections, and it does not make sense to import a career offender-based definition of 'crime of violence' into a departure section in the absence of specific cross-reference. Rather, it is better to permit the district courts to consider all the facts and circumstances surrounding the commission of a crime when deciding whether it qualifies as a nonviolent offense under § 5K2.13.

*Id.* at *4–6 (citations omitted). We vacated our panel decision in *Askari* for reconsideration *en banc.*

**II.**

■ The able district judge, following our decision in *United States v. Rosen,* 896 F.2d 789 (3d Cir.1990), determined that he lacked authority to depart downward.[5] We review for "abuse of discretion." *See United States v. Sally,* 116 F.3d 76, 78 (3d Cir.1997). By definition, a district court "abuses its discretion when it makes an error of law. That a departure decision, in an occasional case, may call for a legal determination does not mean, as a consequence, that parts of the review must be labeled *de novo* while other parts are labeled an abuse of discretion." *Koon v. United States,* 518 U.S. 81, 100, 116 S.Ct. 2035, 2047–48, 135 L.Ed.2d 392 (1996) (citations omitted). "The abuse of discretion standard includes review to determine that the discretion was not guided by erroneous legal conclusions." *Id.* at 100, 116 S.Ct. at 2048.

---

**4.** USSG § 4B1.1 enhances the offense level for "career offenders." *See* USSG § 4B1.1, comment. (backg'd.) (28 U.S.C. § 994(h) "mandates that the Commission assure that certain 'career' offenders receive a sentence of imprisonment 'at or near the maximum term authorized.'" USSG § 4B1.1 implements this directive by employing a definition of career offender that tracks in large part the criteria set forth in 28 U.S.C. § 994(h)). USSG § 4B1.2 provides definitions for terms

used in USSG § 4B1.1, including "crime of violence."

**5.** *See* App. at 45a ("I cannot depart downward for diminished capacity at the time of the offense based on the guidelines as I read them. They at least contain a policy statement that a downward departure for diminished capacity is limited to non[-]violent offenses").

### III.

### A.

#### 1.

USSG § 5K2.13, a policy statement permitting downward departures,[6] provides:

> If the defendant committed a *non-violent offense* while suffering from significantly reduced mental capacity not resulting from voluntary use of drugs or other intoxicants, a lower sentence may be warranted to reflect the extent to which reduced mental capacity contributed to the commission of the offense, *provided that the defendant's criminal history does not indicate a need for incarceration to protect the public.*

USSG § 5K2.13, p.s. (emphasis supplied).

"Non-violent offense" is not defined in either USSG § 5K2.13 or the commentary.[7] But the term "crime of violence" is defined in the "career offender" provisions of chapter 4.[8] USSG § 4B1.1 enhances the offense level for career offenders, and USSG § 4B1.2

provides definitions for terms used in USSG § 4B1.1, including "crime of violence":

> The term 'crime of violence' means any offense under federal or state law, punishable by imprisonment for a term exceeding one year, that—
>
> (1) has as an element the use, attempted use, or threatened use of physical force against the person of another, or
>
> (2) is burglary of a dwelling, arson, or extortion, involves use of explosives, or otherwise involves conduct that presents a serious potential risk of physical injury to another.

USSG § 4B1.2(a).

An accompanying application note expands on this definition with concrete examples:

> 'Crime of violence' includes murder, manslaughter, kidnaping, aggravated assault, forcible sex offenses, *robbery*, arson, extortion, extortionate extension of credit, and burglary of a dwelling. Other offenses are included as 'crimes of violence' if (A) *that*

---

**6.** "The Guideline Manual contains three [types] of text: guidelines provisions, policy statements and commentary." *United States v. Corrado*, 53 F.3d 620, 624 (3d Cir.1995). "When a crime is covered by the Sentencing Guidelines, the sentence is computed based not only on the relevant guidelines, but also on the Sentencing Commission's policy statements and commentary." *United States v. Thompson*, 70 F.3d 279, 281 (3d Cir.1995) (per curiam) (citing *United States v. Bertoli*, 40 F.3d 1384, 1404–05 (3d Cir.1994)).

The Supreme Court has stated "[t]he principle that the Guidelines Manual is binding on federal courts applies as well to policy statements." *Stinson v. United States*, 508 U.S. 36, 42, 113 S.Ct. 1913, 1917–18, 123 L.Ed.2d 598 (1993). "Furthermore, where 'a policy statement prohibits a district court from taking a specified action, the statement is an authoritative guide to the meaning of the applicable guideline.'" *Corrado*, 53 F.3d at 624 (citing *Williams v. United States*, 503 U.S. 193, 201, 112 S.Ct. 1112, 1119–20, 117 L.Ed.2d 341 (1992); *United States v. Reilly*, 33 F.3d 1396, 1424 n. 1 (3d Cir.1994)). *See, e.g., United States v. Brannan*, 74 F.3d 448, 454 n. 9 (3d Cir.1996) ("both the Policy Statements and the Commentary in the Sentencing Guidelines are binding on the federal courts") (citation omitted).

**7.** The sentencing guidelines describe departures:

The sentencing statute permits a court to depart from a guideline-specified sentence only when it finds 'an aggravating or mitigating

circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence different than that described.' 18 U.S.C. § 3553(b). The Commission intends the sentencing courts to treat each guideline as carving out a 'heartland,' a set of typical cases embodying the conduct that each guideline describes. When a court finds an atypical case, one to which a particular guideline linguistically applies but where conduct significantly differs from the norm, the court may consider whether a departure is warranted. USSG Ch. 3, Pt. A, intro. comment.

**8.** Chapter 4 of the sentencing guidelines addresses criminal history:

The Comprehensive Crime Control Act sets forth four purposes of sentencing. (*See* 18 U.S.C. § 3553(a)(2).) A defendant's record of past criminal conduct is directly relevant to those purposes. A defendant with a record of prior criminal behavior is more culpable than a first offender and thus deserving of greater punishment. General deterrence of criminal behavior will aggravate the need for punishment with each recurrence. To protect the public from further crimes of the particular defendant, the likelihood of recidivism and future criminal behavior must be considered. Repeated criminal behavior is an indicator of a limited likelihood of successful rehabilitation. USSG Ch.4, Pt. A, intro. comment.

*offense has an element the use, attempted use, or threatened use of physical force against the person of another,* or (B) the conduct set forth (*i.e.,* expressly charged) in the count of which the defendant was convicted involved use of explosives (including any explosive material or destructive device) or, by its nature, presented a serious potential risk of physical injury to another.

'Crime of violence' does not include the offense of unlawful possession of a firearm by a felon.

USSG § 4B1.1, comment. (n.1) (emphasis supplied).[9] If "non-violent" offense in USSG § 5K2.13 is defined by reference to the term "crime of violence" in USSG § 4B1.2 and its commentary, then bank robbery would never qualify as a "non-violent" offense.

The general application principles articulated in the Introduction to the sentencing guidelines supply a list of definitions "that are used frequently in the guidelines and are of general applicability (except to the extent expressly modified in respect to a particular guideline or policy statement)." USSG § 1B1.1, comment. (n.2). But, "nonviolent offense" and "crime of violence" do not appear in this list of definitions. The Introduction also dictates that "[d]efinitions of terms also may appear in other sections. Such definitions are not designed for general applicability; therefore, their applicability to sections other than those expressly referenced must be determined on a case by case basis." USSG § 1B1.1, comment. (n.2).

### 2.

■ Askari was convicted of bank robbery in violation of 18 U.S.C.A. § 2113(a):

[w]hoever, by force and violence, or by intimidation, takes, or attempts to take, from the person or presence of another, or obtains or attempts to obtain by extortion any property or money or any other thing of value belonging to, or in the case, custo-

dy, control, management, or possession of, any bank, credit union, or any savings and loan association.

"The requirement that property be taken either 'by force and violence' or 'by intimidation' requires proof of force or threat of force as an element of the offense." *United States v. Maddalena,* 893 F.2d 815, 819 (6th Cir.1989).

■ In determining whether intimidation is present, an objective standard is employed from the perspective of the victim, *i.e.,* "whether 'an ordinary person in the teller's position reasonably could infer a threat of bodily harm from the defendant's acts.'" *United States v. Woodrup,* 86 F.3d 359, 363 (4th Cir.) (citations omitted), *cert. denied,* —— U.S. ——, 117 S.Ct. 332, 136 L.Ed.2d 245 (1996).

As used in § 2113(a), the term 'intimidation' means 'to make fearful or put into fear.'

The Government is not required to show either an 'express verbal threat or threatening display of a weapon.' Actual fear need not be proven, if the acts of the defendant would threaten an ordinary reasonable person. Thus, the government need show only that an ordinary person in the teller's position would feel a threat of bodily harm from the perpetrator's acts.

*United States v. McCarty,* 36 F.3d 1349, 1357 (5th Cir.1994) (citations omitted). *See also Maddalena,* 893 F.2d at 819 (same).

The district court sentenced Askari under USSG § 2B3.1 ("Robbery, Extortion, Blackmail") which punishes, *inter alia,* robbery of the property of a financial institution. USSG § 2B3.1 does not define the term "non-violent" offense, perhaps because the crime of robbery contemplates at least some force, threat of force, or intimidation. While USSG § 2B3.1 provides for a guideline increase if a

---

9. While USSG § 5K2.13 is a policy statement, the specific definitions of "crime of violence" that accompany USSG § 4B1.2 in the application notes are "commentary." *See United States v. McQuilkin,* 97 F.3d 723, 731 (3d Cir.1996) ("Commentary in the guidelines is binding unless

it runs afoul of the Constitution or a federal statute, or is plainly erroneous or inconsistent with the section of the guidelines it purports to interpret") (citation omitted), *cert. denied,* —— U.S. ——, 117 S.Ct. 2413, 138 L.Ed.2d 178 (1997).

death threat was made, it is silent on the threat of bodily harm.[10]

## B.

Against this backdrop we examine the conflict among several courts of appeals interpreting "non-violent offense" in USSG § 5K2.13. The discussion has centered on whether a sentencing judge must categorically adopt the "crime of violence" definition in USSG § 4B1.2 or whether the judge has discretion to look to the facts and circumstances in each case.

## 1.

In *Rosen,* the defendant pled guilty to sending a threatening communication through the mail to extort money through threat of injury, in violation of 18 U.S.C. § 876. Defendant, an admitted compulsive gambler, wrote checks from a home equity credit line to satisfy growing gambling losses. Unable to make payment, he sent letters to three acquaintances representing that, unless money was received, their relatives would be harmed.

At sentencing, defendant presented expert testimony about his compulsive gambling and argued that he neither intended nor had the capability to carry out the threats made in the letters. Sentencing the defendant under USSG § 2B3.2 ("Extortion by Force or Threat of Injury or Serious Damage"), the district court determined that defendant's compulsive gambling did not constitute a mitigating factor justifying departure below the guideline minimum.

On appeal, defendant contended, *inter alia,* the district court incorrectly refused to apply USSG § 5K2.13 because his crime was

non-violent, *i.e.,* it did not involve physical force. We disagreed:

> Crimes of violence, however, include situations where force is threatened but not used. In other contexts, crimes of violence have been defined as offenses that have 'as an element the use, attempted use, or threatened use of physical force.' 18 U.S.C. § 16 (1988) ... *see* U.S.S.G. § 4B1.2, comment. (n.1). Defendant would have us conclude that § 5K2.13's use of the term 'non-violent' means something other than the opposite of a crime of violence.
>
> We can find no support for such a contention and therefore find no error in the district court's determination that defendant's crime was not 'nonviolent.' *See United States v. Borrayo,* 898 F.2d 91 (9th Cir.1989); *cf. United States v. Poff,* 723 F.Supp. 79 (N.D.Ind.1989). Consequently, guideline § 5K2.13 does not authorize a downward departure for this defendant's mental condition.

*Rosen,* 896 F.2d at 791. We looked to the "crime of violence" definition contained in USSG § 4B1.2 to determine whether the defendant was entitled to a downward departure in USSG § 5K2.13 for "non-violent offenses." Because defendant's crime constituted a "crime of violence," we found USSG § 5K2.13 inapplicable.

As recently as this year, we have cited *Rosen. See United States v. McBroom,* 124 F.3d 533, 542 (3d Cir.1997) ("The basis for our holding in *Rosen* was that the definition of 'crime of violence' contained in section 4B1.2, which is the career offender provision, governs the meaning of 'non-violent' offense in section 5K2.13 .... we are[bound] by our decision in *Rosen,* 3d Cir. I.O.P. 9.1").

---

10. USSG § 2B3.1(b)(2)(F) calls for an increase of 2 levels "if a threat of death was made."

'threat of death' ... may be in the form of an oral or written statement, act, gesture, or combination thereof. Accordingly, the defendant does not have to state expressly his intent to kill the victim in order for the enhancement to apply. For example, an oral or written demand using words such as 'Give me the money or I will kill you,' 'Give me the money or I will pull the pin on the grenade I have in my pocket,' 'Give me the money or I will shoot

you,' 'Give me the money or else (where the defendant draws his hand across his throat in a slashing motion),' or 'Give me the money or you are dead' would constitute a threat of death. The court should consider that the intent of this provision is to provide an increased offense level for cases in which the offender(s) engaged in conduct that would instill in a reasonable person, who is a victim of the offense, a fear of death.

USSG § 2B3.1, comment. (n.6).

**2.**

As we have noted, the question of whether "non-violent offense" in USSG § 5K2.13 may be defined by reference to "crime of violence" in USSG § 4B1.2 has been answered differently by the different courts of appeals. Five other circuits are in accord with *Rosen.* *See United States v. Mayotte,* 76 F.3d 887, 889 (8th Cir.1996) ("The phrase 'non-violent offense' is not defined in the guidelines. However, the term 'crime of violence' is defined in Section 4B1.2 of the sentencing guidelines. We believe that a 'nonviolent offense' necessarily excludes 'crime of violence' "); *United States v. Dailey,* 24 F.3d 1323, 1327 (11th Cir.1994) ("downward departure was not permissible for reduced mental capacity under U.S.S.G. § 5K2.13 after Dailey was convicted of a 'crime of violence' "); *United States v. Cantu,* 12 F.3d 1506, 1513 (9th Cir.1993) ("We have defined 'non-violent' as the converse of a 'crime of violence' under U.S.S.G. § 4B1.2(1)(i)"); *United States v. Maddalena,* 893 F.2d 815, 819 (6th Cir.1989) ("the commentary to section 4B1.2 of the guidelines includes robbery as an offense covered by the provision.... Thus section 5K2.13 is not applicable to defendant, for he did not commit a nonviolent offense"); *United States v. Poff,* 926 F.2d 588, 591 (7th Cir.1991) ("We decline to adopt [the defendant's] argument that rests on the premise that the Guidelines define the same act as both a 'crime of violence' and a 'nonviolent' offense") (citation omitted) (en banc) (6–5 decision), *cert. denied,* 502 U.S. 827, 112 S.Ct. 96, 116 L.Ed.2d 67 (1991).

Two courts of appeals have embraced the view that the district court's discretion to depart downward under USSG § 5K2.13 should not be restricted by USSG § 4B1.2. *See United States v. Weddle,* 30 F.3d 532, 540 (4th Cir.1994) ("the Sentencing Commission did not intend to import [the 'crime of violence' definition] from [USSG § 4B1.2 to USSG § 5K2.13]"). *See also United States v. Morin,* 124 F.3d 649, 653 (4th Cir.1997) ("Although a definition of crimes of violence is found elsewhere in the guidelines, we have held that the definition of 'crime of violence' in § 4B1.2 of the sentencing guidelines (regarding career offenders) is not applicable to

§ 5K2.13 and its reference to 'non-violent'-violent' offense"); *United States v. Chatman,* 986 F.2d 1446, 1450 (D.C.Cir.1993) ("we are not persuaded that section 4B1.2 should govern the application of section 5K2.13. Rather, we believe that the sentencing court has broad discretion under section 5K2.13 to examine all the facts and circumstances of a case to determine whether a particular offense was in fact 'non-violent' ").

In addition, five dissenting judges in the *Poff* decision share the same view. *Poff,* 926 F.2d at 595 ("different terms in a carefully drafted code such as the guidelines connote different things ... 'non-violent' offense refers to crimes that in the event did not entail violence. When prison is not justified by the need to incapacitate the defendant, § 5K2.13 is available") (Easterbrook, J., dissenting). Review of *Poff* and *Chatman* illustrates the distinctions. *See Weddle,* 30 F.3d at 538 ("The Seventh Circuit's *Poff* decision and the D.C. Circuit's *Chatman* decision provide the only detailed analyses of the issue presented").

**3.**

The *Poff* majority provides an elaborate argument in favor of the first view—that USSG § 4B1.2's "crime of violence" definition controls USSG § 5K2.13's "non-violent offense" requirement. First, the *Poff* majority emphasized the similarity between the two phrases:

> Courts often say that the choice of different words reflects an intent to say something different. But here the Commission used the same word—'violence.' True, in one case it used a negative construction—'non-violent'—and in the other case used a prepositional phrase containing the noun 'violence' as a modifier rather than using the simpler adjective 'violent'—but the root, and meaning, are the same in both cases.... The Guidelines should be read as a whole, § 1B1.1(i), and when the same word appears in different, though related sections, that word likely bears the same meaning in both instances.

*Poff,* 926 F.2d at 591 (citations omitted).

The *Poff* majority then looked to the Armed Career Offender provision of 18

U.S.C.A. § 924(e)(2)(B)(i) (West Supp.1997) where Congress defined "violent felony" to include any crime that, *inter alia,* "has as an element of the use, attempted use, or threatened use of physical force against another," believing that definition mirrored USSG § 4B1.2's "crime of violence." The *Poff* majority reasoned: "[i]f it is difficult to discern a difference between 'violent offense' and 'crime of violence,' it is well nigh impossible to divine any distinction between a 'violent felony' and a 'violent offense.' " *Id.* at 592.

According to the *Poff* majority, if the Sentencing Commission wanted to differentiate between different types of violence, it would have expressly included an alternative definition in USSG § 5K2.13:

> We think it likely that had the Commission desired to distinguish among types of violence, it would have expanded its vocabulary. At a minimum, it would have offered a technical definition for each term. Perhaps a cross-reference between the two sections would have eliminated any possibility of confusion, but hindsight is a demanding critic. It is hardly surprising that the Commission failed to foresee the argument that a crime of violence can, under the same sentencing scheme, also be a non-violent offense.

\*　　\*　　\*　　\*　　\*　.　\*

> Even if we believed that the Commission intended to define violence differently in § 5K2.13, we could do little but guess as to its meaning.

*Id.* at 592 (citations omitted).

Looking to the underlying objectives of the two provisions at issue, the *Poff* majority stated:

> The Guidelines reflect the view that those who have a history of crimes of violence merit increased incarceration, and include those, like appellant, who have threatened violence in that category of defendants. In addition to limiting the authority of courts to decrease the sentences of defendants with reduced mental capacity to cases in which the defendant committed a non-violent offense, § 5K2.13 further circumscribed the authority of courts to depart on this basis by adding the proviso that 'the

defendant's criminal history does not indicate a need for incarceration to protect the public.' Career offenders, by definition, fail to meet this condition.... So even if the terms 'non-violent offense' and 'crime of violence' were not mutually exclusive, § 5K2.13 would not have authorized the district court to depart.

\*　　\*　　\*　　\*　　\*　　\*

> Because those suffering mental incapacities are effectively less deterrable (making the need for incapacitation greater), it would not be unreasonable to assume that the Commission believed departures to be warranted only when there is little prospect that such a defendant will manifest any form of violent behavior. That this reading would not subvert the purpose of § 4B1.1 is a point that further commends it.

*Id.* at 592–93 (citations omitted). The *Poff* majority view still holds in the United States Court of Appeals for the Seventh Circuit. *See United States v. Sullivan,* 75 F.3d 297, 300 (7th Cir.1996) ("this panel is bound by the *en banc* decision in *Poff* and thus we affirm the district court's denial of a downward departure under § 5K2.13").

### 4.

The arguments of the *Poff* majority were countered by Judge Easterbrook, who authored the dissenting opinion. Both *Chatman* from the Court of Appeals for the District of Columbia Circuit and *Weddle* from the Court of Appeals for the Fourth Circuit adopted and expanded upon the rationale articulated in the *Poff* dissent. We outline the principal arguments set forth by the *Poff* dissent and the *Chatman* and *Weddle* decisions here.

Starting with the text of USSG § 5K2.13, these decisions note that "[n]othing in the Guidelines themselves or in the Application Notes suggests that section 4B1.2 is meant to control the interpretation and application of section 5K2.13." *Chatman,* 986 F.2d at 1450. The omission from USSG § 5K2.13 of either the phrase "crime of violence" or a cross-reference was intentional:

It would have been easy to write § 5K2.13 to say that the judge may depart unless the defendant committed a 'crime of violence' as § 4B1.2 defines it; instead, the Commission selected different formulations. Although it laid out a detailed meaning for 'crime of violence' in § 4B1.2, it did not provide so much as a cross-reference in § 5K2.13, a curious omission if the Commission meant to link these phrases so tightly that they are mutually exclusive.

*Poff*, 926 F.2d at 594 (Easterbrook, J., dissenting). *See Chatman*, 986 F.2d at 1450 ("The lack of a cross-reference is all the more significant because so many of the Guidelines use explicit cross-referencing").

While the sentencing guidelines have been frequently amended, these decisions observe that the Sentencing Commission has never altered USSG § 5K2.13 to specifically incorporate the "crime of violence" definition. *See Chatman*, 986 F.2d at 1450 ("Moreover, the Commission has amended section 4B1.2 and its commentary twice in the last two years, and neither time did the Commission suggest any relationship between section 5K2.13 and section 4B1.2") (citing *Poff*, 926 F.2d at 594 (Easterbrook, J., dissenting)).

Despite the common root word shared by "crime of violence" and "non-violent offense," the phrases may take meanings other than as opposites:

As the Commission was at pains to establish in § 4B1.2, whether a crime is one 'of violence' depends on its elements and not on the defendant's conduct, so that an unrealized prospect of violence makes the crime one of violence. This is an abnormal sense, a term of art. It took a detailed definition to make it so. Then comes § 5K2.13, in which 'non-violent offense' appears without elaboration or cross reference. Best to read these words in their ordinary sense rather than as tied to the term of art in § 4B1.2. A 'non-violent offense' in ordinary legal (and lay) understanding is one in which mayhem did not occur. The prospect of violence ... sets the presumptive range; when things turn out better than they might, departure is permissible.

*Poff*, 926 F.2d at 594 (Easterbrook, J., dissenting).

Furthermore, these sections address different concerns. USSG § 4B1.1 prescribes a formula to determine whether a defendant is a "career offender" who warrants increased incarceration because of an extensive criminal history.

In section 994(h), Congress directed the Commission to ensure that the Guidelines specify prison sentences that are 'at or near the maximum term authorized' for 'career offenders,' which include those who have 'been convicted of a felony that is either a crime of violence or a drug offense and who have been previously convicted of two felonies where each has either a crime of violence or a drug offense.' Longer sentences for such offenders are justified by the purposes of incarceration, as set out in 18 U.S.C. § 3553(a)(2).... [They] guarantee incapacitation of those repeat offenders whose past records suggest a propensity to commit violent crimes.

Reflecting these policy concerns, the definition of 'crime of violence' in section 4B1.2 is distinctively a 'term of art' designed to identify career offenders .... section 4B1.2 appears to characterize as 'crimes of violence' many offenses that, taken individually on their facts, might be interpreted as non-violent.

*Chatman*, 986 F.2d at 1451 (citations omitted). By contrast, USSG § 5K2.13 encourages more lenient treatment:

the policy concerns that motivate the definition of 'crime of violence' in section 4B1.2 are not applicable to section 5K2.13 .... [the purpose of which] is to treat with lenity those individuals whose 'reduced mental capacity' contributed to the commission of a crime.

\* \* \* \* \* \*

Considered in this context, the term 'non-violent offense' in section 5K2.13 refers to those offenses that, in the act, reveal that a defendant is not dangerous, and therefore need not be incapacitated for

the period of time the Guidelines would otherwise recommend.

*Chatman,* 986 F.2d at 1451–52 (citations omitted). *See Weddle,* 30 F.3d at 540 ("U.S.S.G. § 5K2.13 is intended to create lenity for those who cannot control their actions but are actually dangerous; U.S.S.G. § 4B1.2 is intended to treat harshly the career criminal, whether or not their actual crime is in fact violent"); *Poff,* 926 F.2d at 595 ("A hefty sentence may be appropriate simply because it incapacitates and so reduces the likelihood of further offenses. When the described person's conduct is nonviolent, however, incapacitation is less important.... Because legal sanctions are less effective with persons suffering from mental abnormalities, a system of punishment based on deterrence also curtails sanction") (Easterbrook, J., dissenting).

This approach allows the district judge to make a fact-specific inquiry not governed by the "crime of violence" definition of USSG § 4B1.2. *See Chatman,* 986 F.2d at 1450 ("we are not persuaded that section 4B1.2 should govern the application of section 5K2.13. Rather ... the sentencing court has broad discretion under section 5K2.13 to examine all the facts and circumstances of a case to determine whether a particular offense was in fact 'nonviolent' ").[11]

## C.

■ As noted, the *en banc* court enables us to examine again the language, structure, and purpose of the sentencing guidelines and to appraise again the definition of "nonviolent offense" in USSG § 5K2.13. Although our initial view set forth in *Rosen* was a reasoned interpretation that now represents the view of most courts of appeals, we now believe the analysis of the relationship between USSG § 5K2.13 and USSG § 4B1.2 articulated by the dissent in *Poff* and later developed in *Chatman* and *Weddle* is more convincing.

Without detailing those arguments already set forth, we find especially compelling the following observations. First, USSG § 5K2.13 contains no cross-reference to USSG § 4B1.2's definition of "crime of vio-

lence." Even though the Sentencing Commission has amended the sentencing guidelines over five-hundred times in the last nine years, it has made no cross-reference in USSG § 5K2.13 linking "non-violent offense" to the "crime of violence" definition in § 4B1.2.

Second, by limiting USSG § 5K2.13 to those defendants whose "criminal history does not indicate a need for incarceration to protect the public," the Sentencing Commission removed the USSG § 5K2.13 departure from the reach of "career offenders." Having done so, it makes little sense to import a definition of "non-violent offense" from the section on career offenders.

Third, USSG § 1B1.1 articulates a list of definitions of general applicability which includes neither "crime of violence" nor "nonviolent" offense. That provision specifies: "[d]efinitions ... [which] appear in other sections .... are not designated for general applicability; therefore their applicability to sections other than those expressly referenced must be determined on a case by case basis." USSG § 1B1.1, comment. (n.2). USSG § 4B1.2's "crime of violence" definition is therefore one of limited applicability.

Fourth, USSG § 4B1.1 and USSG § 5K2.13 address different policy concerns. While USSG § 4B1.1 increases sentences for persons whose criminal records suggest a propensity to commit violent crimes, USSG § 5K2.13 encourages more lenient treatment for persons who are not actually dangerous but whose reduced mental capacity contributed to the commission of a crime.

In short, the choice of different phrasing, the absence of a cross-reference, and the explicit definitions attached to one section but not the other, all suggest that the Sentencing Commission did not intend to import the "crime of violence" definition from USSG § 4B1.2 to USSG § 5K2.13. Of course the Sentencing Commission could adopt a definition of "non-violent offense" which, if in conformity with the statute, could be binding on the district judge. Or it could delete the

---

**11.** Judge Stapleton's elaboration in his concurrence on the differences between the *Poff* dissent and *Chatman* is instructive.

reference to "non-violent offense" in USSG § 5K2.13. But in the absence of some direction from the Sentencing Commission, we are unwilling to apply the "crime of violence" definition articulated in USSG § 4B1.2 to USSG § 5K2.13.

Although we find convincing many of the arguments put forth in the *Poff* dissent, *Chatman,* and *Weddle,* we take a somewhat different view of the applicable standard. Those cases direct the district judge applying USSG § 5K2.13 to make a fact specific inquiry whether a defendant has committed a "non-violent offense." The question remains whether there is anything that constrains the district court's review of the "facts and circumstances" of the crime.

### D.

■ In modern criminology, there has always been a distinction between culpability and sanction, between finding guilt and imposing sentence. Until recently, sentencing had been the courts' unique role. Before the advent of mandatory sentences and sentencing guidelines, courts routinely looked to all the facts and circumstances before passing sentence. Indeed, the severe effects of a "borderline" conviction were often mitigated by a lenient sentence.

But the Sentencing Reform Act brought with it significant changes. Since adoption of the sentencing guidelines, the fact of conviction, whatever the nature or character of the crime, has carried concrete and sometimes

rigid sanctions (even un-convicted conduct can now be punished as relevant conduct). Through the means of downward departures (which is what concerns us here), the Sentencing Commission has attempted to ameliorate the consequences of certain kinds of convictions. This is difficult to do, especially when it involves pinpointing behavior in an almost infinite spectrum and affixing quantitative values. But whether the existing guideline structure can permit the Sentencing Commission to fashion a just downward departure in every case where it is appropriate, it is clear that the Sentencing Commission did not intend to allow departures in USSG § 5K2.13 for offenders who may be dangerous to the public.

We agree that the district court should look at all the facts and circumstances of the crime, but it should do so within the context of the Sentencing Reform Act and the underlying statute defining criminal culpability. Because the sentencing guidelines offer no "guidance" on how to define "non-violent offense," we are led back to the enabling statute, the Sentencing Reform Act,[12] and its articulation of the factors to be considered in imposing sentence.[13] Of particular interest here, when trying to define "non-violent offense," is the need for the sentence imposed to reflect the seriousness of the offense, to protect the public, and to provide just punishment.

■ To assess the seriousness of the of-

---

**12.** 18 U.S.C. § 3553(b) provides, in part:

  **(b) Application of guidelines in imposing a sentence.**.... In the absence of an applicable sentencing guideline, the court shall impose an appropriate sentence, having due regard for the purposes set forth in subsection (a)(2). In the absence of an applicable sentencing guideline in the case of an offense other than a petty offense, the court shall also have due regard for the relationship of the sentence imposed to the sentences prescribed by guidelines applicable to similar offenses and offenders, and to the applicable policy statements of the Sentencing Commission.

18 U.S.C.A. § 3553(b) (West 1985 & Supp.1997).

**13.** The general factors articulated in 18 U.S.C. § 3553(a) provide, in part:

  **(a) Factors to be considered in imposing a sentence.**—The court shall impose a sentence

sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection.
\* \* \* \* \* \*
  (2) the need for the sentence imposed—
    (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
    (B) to afford adequate deterrence to criminal conduct;
    (C) to protect the public from further crimes of the defendant; and
    (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

18 U.S.C.A. § 3553(a). It appears that, in a specific sense, these factors have been largely supplanted by the sentencing guidelines.

fense,[14] we look to the elements of the crime and the surrounding conduct. Bank robbery, the underlying offense here, consists of taking, or attempting to take, anything of value, by force and violence, by intimidation, or by extortion.[15] The requirement that the property be taken either "by force and violence" or "by intimidation" requires proof of force or threat of force as an element of the offense. *Maddalena*, 893 F.2d at 819. The term "intimidation" means to make fearful or put into fear. *McCarty*, 36 F.3d at 1357. In determining whether intimidation is present, the question is whether an ordinary person in the victim's position reasonably could infer a threat of bodily harm from the defendant's acts. *Id.* "The term 'extortion' as used in 18 U.S.C. 2113(a) means obtaining property from another person, without the other person's consent, induced by the wrongful use of actual or threatened force, violence, or fear."[16] If there is no taking by extortion, actual or threatened force, violence, or intimidation, there can be no valid conviction for bank robbery under 18 U.S.C. § 2113(a). In that case, there could be a conviction under 18 U.S.C. § 2113(b) (theft without threat of force). It would seem, therefore, that with bank robbery convictions under the first paragraph of 18 U.S.C. § 2113(a), a defendant could not qualify for a departure under USSG § 5K2.13 as presently written. Of course, this refers to convictions only under the first paragraph of § 2113(a). The second paragraph of that section describes entering, or attempting to enter, a bank with intent to commit a felony therein. The second paragraph does not necessarily describe a crime of violence; that would depend on the felony.[17]

14. " 'Offense' means the offense of conviction and all relevant conduct under § 1B1.3 (Relevant Conduct) unless a different meaning is specified or is otherwise clear from the context." USSG § 1B1.1, comment. (n.1).

15. 18 U.S.C.A. § 2113(a) provides:

[w]hoever, by force and violence, or by intimidation, takes, or attempts to take, from the person or presence of another, or obtains or attempts to obtain by extortion any property or money or any other thing of value belonging to, or in the case, custody, control, management, or possession of, any bank, credit union, or any savings and loan association.

The second paragraph of this section, which is not applicable here, provides:

Whoever enters or attempts to enter any bank, credit union, or any savings and loan association, or any building used in whole or in part as a bank, credit union, or as a savings and loan association, with the intent to commit in such bank, credit union, or in such savings and loan association, or building, or part thereof, so used, any felony affecting such bank, credit union, or such savings and loan association and in violation of any statute of the United States, or any larceny—

Shall be fined under this title or imprisoned not more than twenty years, or both.

*Id.*

16. H.Rep. No. 99–797, at 33, *reprinted in* 1986 U.S.C.C.A.N. 6138, 6156. *See also* 18 U.S.C.A. § 1951(b)(2) (West 1984 & Supp.1997) (the Hobbs Act)(extortion means "obtaining of property from another, with [their] consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right"). Both the Hobbs Act and 18 U.S.C.

§ 2113(a) punish extortion. The provisions, however, focus on different concerns. *See United States v. Maldonado–Rivera*, 922 F.2d 934, 983 (2d Cir.1990) ("In enacting § 1951, Congress' principal concern was protecting the flow of interstate commerce.... In contrast, in enacting § 2113, Congress's principal concern was to find a means of protecting the institutions in which the Federal Government is interested") (citations omitted), *cert. denied*, 501 U.S. 1211, 111 S.Ct. 2811, 115 L.Ed.2d 984 (1991).

In 1986 Congress amended § 2113(a) to expressly cover extortion directed at federal insured banks and make it the "exclusive provision for prosecuting bank extortion." H.Rep. No. 99–797, at 33, *reprinted in* 1986 U.S.C.C.A.N. 6138, 6156. The Committee Report stated that extortionate conduct had been prosecutable under either the [18 U.S.C. § 2113(a)] or the Hobbs Act, and concluded that clarification as to which should be the applicable statute is desirable. *Id.*

The guidelines make a distinction between "Extortion by Force or Threat of Injury or Serious Damage," USSG § 2B3.2, and "Blackmail and Similar Forms of Extortion," USSG § 2B3.3. The latter applies "only to blackmail and similar forms of extortion where there clearly is no threat of violence to person or property." USSG § 2B3.3, comment. (n.1).

17. *See United States v. Selfa*, 918 F.2d 749, 752 n. 2 (9th Cir.1990) ("The second paragraph [of § 2113(a)] describes an entry or attempt to enter a bank with intent to commit a felony in it. The second paragraph does not describe a crime of violence"), *cert. denied*, 498 U.S. 986, 111 S.Ct. 521, 112 L.Ed.2d 532 (1990); *United States v. Pick*, 724 F.2d 297, 301 (2d Cir.1983) ("Section 2113(a) prohibits entry of a bank with the intent to commit 'any' felony [including mail fraud]

There also may be other cases of bank robbery where USSG § 5K2.13 might apply. Conceivably, a defendant could commit a bank robbery by extortion under the Hobbs Act (18 U.S.C. § 1951(b)(2)) involving neither intimidation, actual violence, nor the threat of violence. Extortion by an official acting under color of right could be a "non-violent offense." *See, e.g., United States v. Adair,* 951 F.2d 316, 318 (11th Cir.1992) ("In a Hobbs Act prosecution of a public official, the government need not prove actual or threatened force, violence or duress because 'the coercive element is supplied by the existence of the public office itself'") (citing *United States v. Williams,* 621 F.2d 123, 124 (5th Cir.1980), *cert. denied,* 450 U.S. 919, 101 S.Ct. 1366, 67 L.Ed.2d 346 (1981)); *United States v. Billups,* 692 F.2d 320, 330 (4th Cir.1982) (Fear of economic harm will sustain a Hobbs Act violation. "The fear need not be the consequence of a direct or implicit threat by the defendant, and the government's burden of proof is satisfied if it shows that the victim feared economic harm and that the circumstances surrounding the alleged extortionate conduct rendered that fear reasonable") (citations omitted), *cert. denied,* 464 U.S. 820, 104 S.Ct. 84, 78 L.Ed.2d 93 (1983); *United States v. Cerilli,* 603 F.2d 415, 425 (3d Cir.1979) ("where extortion under color of official right is charged, one need not prove that the payment was obtained by force, fear or duress"), *cert. denied,* 444 U.S. 1043, 100 S.Ct. 728, 62 L.Ed.2d 728 (1980).

■ We believe that departures under USSG § 5K2.13 exclude conduct that involves actual force, threat of force, or intimidation, the latter two measured under a reasonable person standard. Therefore, "non-violent offenses" under USSG § 5K2.13 are those which do not involve a reasonable per-

ception that force against persons may be used in committing the offense.

Although conviction and sentencing are separate, sentencing has always been tied to the crime of conviction at least in the sense that they must be congruent. If the elements of the crime require a finding of violent conduct, then a valid conviction could hardly permit a sentence based on a finding of non-violent conduct. So long as the bank robbery victim has been threatened with harm, and is seen to have been threatened under an objective standard (reasonable person), the defendant cannot be found to have acted in a non-violent manner.

■ Nonetheless, it may be argued that conduct may be violent (as defined by statute) but still warrant a more lenient sentence if committed by a defendant with diminished mental capacity who is not dangerous to the public (as defined by his criminal history). This may be so, especially where violence is threatened, but the threat is not realized. To put it differently, does the term "non-violent offense" in USSG § 5K2.13 include acts resulting in valid convictions under 18 U.S.C.A. § 2113(a) where the threat of violence was never carried out? Under the current guidelines, we think the answer is yes for the reasons expressed by us and by Judge Stapleton in his thoughtful concurrence.[18]

### E.

■ In this case, Askari was found guilty of bank robbery. The bank teller, Ellen Ishizaki, described the robbery as follows:

The fellow came up to the middle window and he asked us to put our money up on the counter. . . . [H]e said the same thing again. At that point I pressed the alarm

---

and in no way limits its application to robberies, burglaries, or felonies not covered under other sections of the Act"); *United States v. Brown,* 547 F.2d 36, 39 (3d Cir.1976) (Felonious intent is not "made part of the crimes of taking by force and violence or by intimidation (*[subsection] a-first paragraph*)") (emphasis supplied), *cert. denied,* 431 U.S. 905, 97 S.Ct. 1698, 52 L.Ed.2d 389 (1977); *Williams v. United States,* 301 F.2d 276, 277 (7th Cir.1962) (With respect to the second paragraph of § 2113(a), the "intent of Congress was to make any unlawful entry or attempted

entry of a bank, regardless of its current state of habitation, a federal crime").

18. Nevertheless, there appears to be no impediment to the Sentencing Commission's drawing this distinction. For purposes of sentencing, the Sentencing Commission could delete the "non-violent offense" requirement from USSG § 5K2.13. Or, it could condition application of USSG § 5K2.13 on an unrealized threat of violence. But under the current guidelines, we believe no distinction presently exists.

button, the silent alarm. He then pushed his way over to my window, asked me for the money and then he, you know, and I still hesitated and then finally he told me I had three seconds to give him my money. And then I gave him my money.... [I was scared] [b]ecause he had his hand in his shirt and I didn't know if he was going to pull a gun out on me or a knife or, you know, at that point I was, you know, scared.

(App. at 14a). The bank teller, when told that she had three seconds to hand over the money by someone who had his hand in his shirt, was fearful. An ordinary person in the bank teller's position reasonably could infer a threat of bodily harm from Askari's demand and actions. Looking at the elements of the crime and the surrounding conduct, Askari did not commit a "non-violent offense."

Askari was sentenced as a "career offender." (Presentence Report ¶ 33). USSG § 5K2.13 applies only if Askari's criminal history does not indicate a need for incarceration to protect the public. Even if this bank robbery were classified as a non-violent offense, Askari may still not have qualified for a USSG § 5K2.13 departure. Askari's criminal history contains other violent crimes, including two armed bank robberies, suggesting his incapacitation may be necessary. (*See* App. at 56a (district court noting "[t]he Defendant ... has a long history of crime, including violent crime .... the criminal history score in this case takes him pretty much to the top of the range"); Presentence Report ¶¶ 18–32).[19]

## F.

Accordingly, we hold Askari could not qualify for departure under USSG § 5K2.13

because he did not commit a "non-violent offense."

We will affirm the judgment of conviction and sentence.

STAPLETON, Circuit Judge, concurring:

Although it is a close question, I, too, am persuaded that the content of the phrase "non-violent offense," as used in U.S.S.G. § 5K2.13, should not be determined by reference to the definition of the phrase "crime of violence" in U.S.S.G. § 4B1.2. I also conclude that a downward departure is not authorized by § 5K2.13 in this case. However, I reach that conclusion by a route somewhat different from that followed by the court.

Having concluded that the scope of the phrase "nonviolent offense" in U.S.S.G. § 5K2.13 is not controlled by the scope of the phrase "crime of violence" in U.S.S.G. § 4B1.2, one must determine whether Askari's bank robbery offense constitutes a "non-violent offense" for the purposes of U.S.S.G. § 5K2.13. I conclude that it does not because a federal bank robbery conviction necessarily involves a finding that the offense involved actual force or a threat of force and such a finding, in my view, precludes characterization of the offense as a non-violent one for purposes of § 5K2.13.[1]

The *Poff* dissent took note not only of § 5K2.13's requirement that the offense of conviction be "non-violent," but also of its requirement that the defendant's criminal history not indicate a need to protect the public. Read together, this dual requirement suggested to the dissenting judges that § 5K2.13 was intended to authorize leniency for those individuals who suffer from diminished mental capacity that contributed to

19. Askari's criminal convictions include (1) bank robbery at gunpoint (1974); (2) robbery at gunpoint and violation of the Uniform Firearms Act (1980); (3) theft (1982); and (4) possession of a firearm by a convicted felon (1983). (*See* Presentence Report ¶¶ 29–32).

1. I use the term "bank robbery" in the traditional sense. Traditional bank robbery is proscribed by the first paragraph of 18 U.S.C. § 2113(a), which provides:

[w]hoever, by force and violence, or by intimidation, takes, or attempts to take, from the

person or presence of another, or obtains or attempts to obtain by extortion any property or money or any other thing of value belonging to, or in the case, custody, control, management, or possession of, any bank, credit union, or any savings and loan association.

While it has been suggested that a public official may be able to commit bank robbery by "extorting" bank funds without a threat of violence, I would not regard this as traditional bank robbery and I would take no position on the application of § 5K2.13 in such a case.

their crimes so long as neither the history of the defendant nor the character of the crime indicated a need for incapacitation. Against this background, the *Poff* dissent ultimately concluded that a "non-violent offense" is "one in which mayhem did not occur"—one that "in the event did not entail violence." 926 F.2d at 594, 595. This conclusion suggests that leniency is available where the offense of conviction involved any sort of unrealized threat of violence so long as the defendant's criminal history does not indicate the need for incapacitation.

The *Chatman* court similarly read § 5K2.13 as intended to authorize leniency for those whose diminished mental capacity contributed to their crimes so long as neither the crime nor the criminal history indicates a need for incapacitation. It rejected, however, the position of the *Poff* dissent that unrealized threats of violence cannot render an offense a violent one. In the view of the *Chatman* court, "[s]ome offenses that never resulted in physical violence may, nonetheless, indicate that a defendant is exceedingly dangerous, and should be incapacitated." 986 F.2d at 1454. Thus, if the sentencing court determines that "an offense involved a real and serious threat of violence—such as an assault with a deadly weapon," it should conclude that it is not a "non-violent offense" for purposes of § 5K2.13. *Id.* In the case before the *Chatman* court, the defendant had robbed a bank by handing a note to a teller demanding money that stated, "People will get hurt if I don't walk out of this bank." *Id.* at 1447. The case was remanded to the district court presumably for a determination of the defendant's state of mind.

*Chatman* and the *Poff* dissent both take the view that the sentencing court should look to the underlying facts to determine whether the offense was non-violent. I agree, although I believe it may be helpful for a sentencing court to take note of the essential elements of the crime of conviction, not because those elements control the U.S.S.G. § 5K2.13 issue in all cases, but rather because the findings necessarily implicit in a conviction may preclude it from being a "non-violent offense" within the meaning of U.S.S.G. § 5K2.13.[2] Moreover, I take a somewhat different view of the scope of the phrase "non-violent offense."

Askari was charged with bank robbery under the first paragraph of 18 U.S.C. § 2113(a). That offense consists of taking, or attempting to take, anything of value, by force and violence, by intimidation, or by extortion. As the court's opinion demonstrates, the requirement that the property be taken either "by force and violence" or "by intimidation" requires proof of force or threat of force as an element of the offense, and in determining whether intimidation is present, the question is whether an ordinary person in the victim's position reasonably could infer a threat of bodily harm from the defendant's acts. As the court also notes, the term "extortion" as used in 18 U.S.C. § 2113(a) means obtaining property from another person, without the other person's consent, induced by the wrongful use of actual or threatened force, violence, or fear. Thus, in every case in which the defendant is convicted of bank robbery under the first paragraph of § 2113(a), there will be a beyond a reasonable doubt finding that the defendant

**2.** This is, of course, consistent with the obligation of a sentencing judge to accept for sentencing purposes the facts necessarily implicit in the jury's verdict. *United States v. Boggi,* 74 F.3d 470, 478–79 (3d Cir.1996) ("the district [court] ... properly reasoned that 'a guilty verdict, not set aside, binds the sentencing court to accept the facts necessarily implicit in the verdict.' ") (quoting from *United States v. Weston,* 960 F.2d 212, 218 (1st Cir.1992)). While this approach to U.S.S.C. § 5K2.13 produces the same result in a bank robbery case as that reached in *Rosen,* it is analytically distinct and will produce different results in other situations. Under this approach, "nonviolent offense" as used in U.S.S.G.

§ 5K2.13 will (1) exclude from the scope of that section (i.e. exclude from consideration for a departure based on diminished capacity) offenses that would not be "crimes of violence" under U.S.S.G. § 4B1.2(1), as where force against the person of another or the threat thereof is not an essential element (e.g., transportation for purposes of prohibited sexual conduct), but such force or threat thereof is in fact used, and will (2) include in the scope of that section (i.e., include as candidates for such a departure) offenses that would be "crimes of violence" under U.S.S.G. § 4B1.2(1), as where the offense is burglary and no force against the person of another or threat thereof is employed.

was violent or engaged in conduct reasonably perceived as involving a threat of violence.

Under the view taken by the *Poff* dissent, a finding that the defendant's conduct was reasonably perceived as involving a threat of violence is not relevant to whether the offense is a "non-violent" one for purposes of § 5K2.13. Like the *Chatman* court, I reject that view. Section 5K2.13 clearly evidences an intent that there be no downward departure on grounds of diminished mental capacity where incapacitation appears necessary to protect the public, and, in many instances, a threat of violence will be strong evidence of such a need.

While it presents a closer issue, I also reject the *Chatman* court's view that whenever a § 5K2.13 motion is filed in a bank robbery case not involving actualized violence, the Sentencing Commission intended the sentencing court to determine whether the threat was a serious one that would have been acted on had events unfolded differently. Given that the issue turns on the Commission's intent, I look for guidance to the text of § 2B3.1, the "Robbery" Guideline, and the text of the criminal statute that guideline was intended to implement. Like most robbery statutes, the first paragraph of § 2113(a) does not distinguish between situations in which violence actually occurs and situations in which it is threatened but the threat is not realized.[3] Both are regarded as offenses of the same degree of seriousness. Similarly, § 2B3.1 does not distinguish between these two situations. It does not, for example, establish a base offense level for § 2113(a) offenses and then provide for a

specific offense characteristic increase for those situations in which violence actually occurs.[4]

It is my understanding that robberies involving violence and all robberies involving only threats of violence have traditionally been regarded as of equal seriousness because threats of violence necessarily hold an unacceptably high risk of realized violence whether emanating from the robber or from others attempting to respond to the threat. Because an unacceptably high risk of actualized violence and attendant injury exists without regard to whether the defendant expected to commit violence, our society has traditionally considered that factor to be irrelevant to the defendant's culpability in a robbery context.

I agree with the view that the limitations on the downward departure authority conferred by § 5K2.13 are intended to preclude lenity only where no need for incapacitation is indicated. I do not agree, however, that where a person threatens violence in the course of robbing a bank as a result of diminished mental capacity, no need for incapacitation is indicated in the event the sentencing judge believes the threat was not a "serious" one (i.e., probably would not have been carried out had events unfolded differently). As I have noted, the bank robbery statute deals with situations in which there is a high risk of actualized violence and attendant injury without regard to the state of the defendant's mind. Moreover, § 5K2.13 deals with situations in which diminished mental capacity has contributed to the commission of a crime. Thus, applying § 5K2.13 in a bank

---

**3.** Title 18 U.S.C. § 2113(a) provides for a maximum imprisonment of 20 years. Title 18 U.S.C. § 2113(d) provides:

Whoever, in committing, or in attempting to commit, any offense defined in subsections (a) and (b) of this section, assaults any person, or puts in jeopardy the life of any person by the use of a dangerous weapon or device, shall be fined under this title or imprisoned not more than twenty-five years, or both.

On its face, this can be read as punishing bank robbers who engage in actual violence—specifically, assault—during the commission of their crime more severely than those who only threaten violence. This is not the correct reading of § 2113(d), however. In *Simpson v. United States*, 435 U.S. 6, 98 S.Ct. 909, 55 L.Ed.2d 70

(1978), the Supreme Court held that subsection (d) requires more than an assault and that " 'the phrase 'by the use of a dangerous weapon or device' must be read, regardless of punctuation, as modifying both the assault provision and the putting in jeopardy provision.' " *Id.* at 11–12 n. 6, 98 S.Ct. at 912–13 n. 6. Hence, the goal of § 2113(d) is not to punish more severely the actual use of violence in bank robberies under § 2113(a), but rather to punish more severely "the use of a dangerous weapon or device" in such situations. 18 U.S.C. § 2113(d).

**4.** U.S.S.G. § 2B3.1 does provide a specific offense characteristic increase when violence results in personal injury but not for violence *per se*.

robbery context necessarily involves a crime with a high risk of actualized violence and a defendant with a diminished capacity to refrain from such high risk activity. That combination suggests to me a need for incapacitation and makes me reluctant to attribute to the Commission an intent to authorize § 5K2.13 downward departures in bank robbery cases. Because I find nothing in the Guidelines that compels such an attribution, I reject this portion of the *Chatman* court's decision.

I would hold that the scope of the phrase "non-violent offense" in U.S.S.G. § 5K2.13 is not controlled by the scope of the phrase "crime of violence" in U.S.S.G. § 4B1.2. I would nevertheless further hold that a § 5K2.13 downward departure is not authorized where the offense of conviction is bank robbery.

Judge Sloviter joins this concurring opinion.

McKEE, Circuit Judge, concurring with whom LEWIS, Circuit Judge, joins.

I agree with the majority's conclusion that the Sentencing Commission did not intend to import the "crime of violence" definition from the career offender provision of U.S.S.G. § 4B1.2 into U.S.S.G. § 5K2.13. I think the majority is correct in rejecting our prior holding in *United States v. Rosen* and the majority view in *United States v. Poff* in favor of the view espoused by Judge Easterbrook in his dissent in *Poff.* However, I write separately because the majority concludes that Askari's crime was not a "non-violent offense" based upon the elements of the crime. That is inconsistent with the approach taken by the dissent in *Poff,* and those jurisdictions that have followed Judge Easterbrook's reasoning. Rather than deny Askari a § 5K2.13 departure because of the elements of his crime, we should require an individualized inquiry into the specifics of his conduct to determine if his actual conduct amounts to a "non-violent offense" as that

term is used in § 5K2.13, notwithstanding the elements of his crime. However, I nevertheless join in the judgment of my colleagues, because Askari's criminal history indicates that a departure under U.S.S.G. § 5K2.13 is not appropriate because of a need to protect the public.

**I.**

The majority properly rejects our prior holding in *United States v. Rosen,* 896 F.2d 789 (3d Cir.1990). The majority's rejection of the reasoning of *Rosen* is grounded in Judge Easterbrook's dissent in *United States v. Poff,* 926 F.2d 588 (7th Cir.1991), as well as the holding in *United States v. Chatman,* 986 F.2d 1446 (D.C.Cir.1993), and *United States v. Weddle,* 30 F.3d 532, 540 (4th Cir.1994). Maj. Op. at 539. However, the majority parts company with those cases insofar as those cases direct the sentencing court to engage in a fact-specific inquiry concerning the defendant's actual conduct, and the circumstances surrounding the offense, in order to determine if a particular offense is "non-violent" under § 5K2.13. Instead, the majority "take[s] a somewhat different view of the applicable standard." Maj. Op. at 547. It limits its inquiry here to the elements of the crime of conviction and allows those elements to govern its determination of whether Askari committed a "non-violent offense" under § 5K2.13.

The majority reasons, "[i]f the elements of the crime require a finding of violent conduct, then a valid conviction can hardly permit a sentence based on a finding of non-violent conduct." Maj. Op. at 549. After considering the elements of Askari's robbery charge, the majority concludes that robbery under 18 U.S.C. § 2113(a)[1] is a crime of violence barring any consideration as a "non-violent crime" under § 5K2.13. Under this approach, once a sentencing court concludes that the elements of a crime include violence or intimidation, a defendant is no longer eligible for the fact-specific, case by

---

1. 18 U.S.C. § 2113(a) provides, in part, that:
   (a) Whoever, by force and violence, or by intimidation, takes, or attempts to take, from the person or presence of another, or obtains or attempts to obtain by extortion any property or money or any other thing of value belonging to, or in the care, custody, control, management, or possession of, any bank, credit union, or any savings and loan association.

case inquiry that would otherwise govern a departure for a "significantly reduced mental capacity" under § 5K2.13. Although the majority's approach does have a certain logic and symmetry that is quite appealing, I am not persuaded that the analysis under § 5K2.13 ought to be as limited as the majority concludes.

The Sentencing Reform Act and the resulting Sentencing Guidelines have altered the relationship between the offense of conviction, and the criminal sanction that follows to the extent that the symmetry of the majority's analysis is no longer required or appropriate.[2] As the majority correctly points out, the purposes of § 4B1.2 and § 5K2.13 are not the same. The factors that are relevant under § 4B1.2 are not necessarily relevant, or even appropriate, under § 5K2.13. My colleagues in the majority provide a very reasoned and convincing statement of why the definition of "crime of violence" cannot control whether a conviction is for a "non-violent offense" for purposes of a downward departure based upon "reduced mental capacity." However, the majority then restricts the meaning of "non-violent" offense under § 5K2.13 by the very definition that it holds does not apply under that Guideline. Section 4B1.2 defines "crime of violence" to include any offense that "has as an element the use, attempted use, or threatened use of physical force." However, today we adopt the reasoning of Judge Easterbrook's dissent in *Poff*, and the cases that have relied upon it. Under that rationale, a sentencing court should consider "all the facts and circumstances of a case in deciding whether a crime is a 'non-violent offense'" under § 5K2.13. *Chatman*, 986 F.2d at 1453. Once we conclude that we erred in *Rosen* by restricting "non-violent offense" to the definition of "crime of violence," we need no longer tether our § 5K2.13 analysis to the definition in § 4B1.2 that we have just rejected. This point is best illustrated by Judge Easterbrook in his dissent in *Poff*:

As the Commission was at pains to establish in § 4B1.2, *whether a crime is one "of violence" depends on its elements and not on the defendant's conduct,* so that an unrealized prospect of violence make the crime one of violence. This is an abnormal sense, a term of art. It took a detailed definition to make it so. Then comes § 5K2.13, in which "non-violent offense" appears without elaboration or cross-reference. *Best to read these words in their ordinary sense rather than as tied to the term of art in § 4B1.2.* A "non-violent offense" in ordinary legal (and lay) understanding is one in which mayhem did not occur. The prospect of violence (the "heartland" of the offense, in the guidelines' argot) sets the presumptive range; when things turn out better than they might, departure is permissible.

*Poff*, 926 F.2d at 594 (citation omitted) (emphasis added).

One of the purposes of the Sentencing Reform Act was to increase uniformity in sentencing by reducing disparities in sentencing. *See* U.S. Sentencing Guidelines Manual, ch. 1, pt. A, at A3 (U.S.S.G.). However, another important purpose was to increase proportionality in sentencing by imposing different sentences for crimes representing different levels of culpability. *Id.* To reconcile these seemingly contrary goals, the Commission, *inter alia*, provided for departures outside of the guideline range. *See* U.S.S.G. § 5K2.0. A policy that restricts departures based solely upon the elements of an offense is inconsistent with the Commission's attempt to apportion sanctions based upon culpability. Although we may properly conclude that one who commits a more serious crime is more culpable than one who commits a less serious one, that equation does not work where the more serious crime is committed by one who is less culpable because of a reduced mental capacity. "The criminal justice system long has meted out lower sentences to persons who,

---

**2.** *See United States v. Watts,* — U.S. —, 117 S.Ct. 633, 136 L.Ed.2d 554 (1997) (sentencing court may consider conduct of which the jury acquitted a defendant in imposing a sentence following a conviction); *United States v. Baird,* 109 F.3d 856 (3d Cir.), *cert. denied,* — U.S. —,

118 S.Ct. 243, 139 L.Ed.2d 173 (1997) (Guidelines allow a defendant to be sentenced based in part upon conduct contained in counts of an indictment that were dismissed pursuant to a plea bargain).

although not technically insane, are not in full command of their actions." *Poff,* 926 F.2d at 594 (Easterbrook, J., dissenting). Moreover, "[s]carce resources and prison space achieve greater deterrence when deployed against those who are most responsive to the legal system's threats and who pose the greatest danger if not deterred." *Id.* at 595.

Thus, in *Chatman,* which the majority here cites with approval, *see* Maj. Op. at 539, the court held that a defendant was eligible for a downward departure under § 5K2.13 even though he (like Askari) came before the sentencing court convicted of bank robbery. There, the district court had opined that the defendant was ineligible for a § 5K2.13 departure because he had given a teller a threatening note during the bank robbery. The sentencing court concluded that the defendant's conduct therefore amounted to a crime of violence. *Id.* at 1447. The Court of Appeals for the D.C. Circuit relied upon Judge Easterbrook's dissent in *Poff,* and reversed. The court reasoned that § 5K2.13 vested a sentencing court with broad discretion to consider all the relevant facts concerning the offense because the Commission's purpose was "to treat with lenity those individuals whose 'reduced mental capacity' contributed to [sic] commission of a crime." *Id.* at 1452.

> In contrast to the purposes of section 4B1.2, the point of section 5K2.13 is to treat with leniency those individuals whose reduced mental capacity contributed to commission of a crime. Such lenity is appropriate in part because, as Judge Easterbrook points out, two of the primary rationales for punishing an individual by incarceration—desert and deterrence—lose some of their relevance when applied to those with reduced mental capacity. . . .

> .   .   .   .   .

Considered in this context, the term "non-violent offense" in section 5K2.13 refers to those offenses that, in the act, reveal that a defendant is not dangerous, and therefore need not be incapacitated for the period of time the Guidelines would otherwise recommend. A determination regarding the dangerousness of a defendant, as manifested in the particular details of a single crime that he or she has committed, is best reached through a fact-specific investigation.

*Id.* (citations omitted).

Likewise, the Court of Appeals for the Ninth Circuit in *United States v. Cantu* was persuaded that a sentencing court's inquiry into a defendant's eligibility under § 5K2.13 should be undertaken with a view toward lenity. 12 F.3d 1506, 1510 (9th Cir.1993) (citation omitted). There, the court agreed with the analysis in *Chatman,* and noted that "[l]enity is appropriate because the purpose of § 5K2.13 is to treat with some compassion those in whom a reduced mental capacity has contributed to the commission of a crime." *Id.* Although the court in *Cantu* was concerned with whether post-traumatic stress disorder could cause reduced mental capacity under the Guidelines not with whether the defendant committed a "non-violent offense," the court recognized that fact-specific inquiries must be undertaken to determine both the defendant's mental condition and the circumstances of the offense. *See also, United States v. McBroom,* 124 F.3d 533, 547 (3d Cir.1997) ("Section 5K2.13 is intended to create lenity for those whose significantly reduced mental capacity cause them to commit the offense of conviction.").

Thus, I conclude that Askari is not ineligible for a § 5K2.13 departure solely because of his robbery conviction. The record shows that, although Askari had his hand underneath his shirt when he ordered the bank teller to give him money, two bank employees chased him from the bank. I submit, therefore, there is a genuine issue as to just how frightening or intimidating he was during the commission of the crime. However, I do not minimize the intimidation of the bank teller whom Askari confronted. *See* Maj. Op. at 539. Instead, the teller's reaction should be assessed along with all of the other evidence in concluding whether, based upon the totality of the circumstances, Askari committed a "non-violent offense" under § 5K2.13. A sentencing court should make that determination independently of the definition contained in § 4B1.2 (which, as noted above, includes the elements of the offense). Bar-

ring other considerations, a defendant's eligibility for a § 5K2.13 departure can be determined only after the completion of such an individualized inquiry.

## II.

Despite my disagreement with the conclusion of the majority of my colleagues, I agree with the majority's ultimate decision to affirm the sentence because there are additional considerations under the departure provision. Section 5K2.13 is not only restricted to persons whose offense is non-violent, it also requires that "a defendant's criminal history does not indicate a need for incarceration to protect the public." *See* U.S.S.G. § 5K2.13. Here, the district court noted that Askari had a long history of crime, including violent crime. (App. at 56a.) Therefore, I agree that regardless of whether or not the bank robbery in this case is classified as a "nonviolent offense," Askari is ineligible for the departure because his criminal history does suggest a need to protect the public. Thus, I concur in the judgment of the majority.

GARTH, Circuit Judge, concurring:

I agree that the order of the district court should be affirmed. However, I reach this result by relying on the logic and common sense of Judge Seitz's opinion for our court in *United States v. Rosen*, 896 F.2d 789 (3d Cir.1990), and its conclusion that the term "non-violent offense" cannot mean something other than the opposite of a "crime of violence."

*Rosen* teaches that a defendant who has committed a "crime of violence" according to USSG § 4B1.2(a) is not eligible for a downward departure for commission of a "nonviolent offense" with reduced mental capacity under USSG § 5K2.13. *See id.* at 791. Because Askari was convicted of a "crime of violence," namely bank robbery, he is obvi-

ously ineligible to receive the grant of a downward departure authorized by § 5K2.13 and the order of the district court imposing a sentence of 210 months in prison should be affirmed.

The court today correctly affirms the order of the district court, but on its path to doing so, rejects *Rosen.* My colleagues take the position that the "crime of violence" definition of USSG § 4B1.2(a) should not be used to determine whether a defendant has committed a "nonviolent offense" according USSG § 5K2.13. For essentially those reasons stated by the Sixth, Seventh, Eighth, Ninth, and Eleventh Circuits, I do not find this position persuasive. *See United States v. Mayotte,* 76 F.3d 887, 889 (8th Cir.1996); *United States v. Poff,* 926 F.2d 588, 591–93 (7th Cir.1991) (en banc); *United States v. Russell,* 917 F.2d 512, 517 (11th Cir.1990); *United States v. Maddalena,* 893 F.2d 815, 819 (6th Cir.1989); *United States v. Borrayo,* 898 F.2d 91, 94 (9th Cir.1989); *see also United States v. Chatman,* 986 F.2d 1446, 1454–55 (D.C.Cir.1993) (D.H.Ginsburg, J., concurring).

In light of the many opinions on this issue already found in the Federal Reporter, I feel no need to rehash the familiar arguments in favor of *Rosen.*[3] However, our court's inability to agree on a standard to replace *Rosen* provides a new perspective from which to appreciate its strength.

Having agreed to reject *Rosen*'s teaching that a "nonviolent offense" is defined by § 4B1.2(a), my colleagues have diverged in their efforts to come up with a new definition. Reaching back to first principles of "modern criminology," the majority has promulgated a definition of "non-violent offense" that it believes will respond to "the need for the sentence imposed to reflect the seriousness of the offense, to protect the public, and

---

**3.** Briefly, however, the pro-*Rosen* arguments may be summarized as follows. First, common sense dictates that a "non-violent offense" is the converse of a "crime of violence." Second, the parallel structure of § 4B1.1 and § 5K2.13 suggests that the same definition should be used to assess whether the violent nature of a defendant's crime should support a modification of the defendant's sentence. Third, the Guidelines should be read as a whole, and when the same word appears in related sections, we should assume that the word carries the same meaning in both. Fourth, the term "crime of violence" is a broad phrase that appears in other sections of the Guidelines apart from § 4B1.1. *See, e.g.,* USSG §§ 2K2.1, 2K1.3, 4A1.1. Its meaning therefore can be exported to § 5K2.13 as well as to these other sections.

to provide just punishment." Maj. Op. at 547. Under the majority rule,

departures under USSG § 5K2.13 exclude conduct that involves actual force, threat of force, or intimidation, the latter two measured under a reasonable person standard. *Therefore, "non-violent offenses" under USSG § 5K2.13 are those which do not involve a reasonable perception that force against persons may be used in committing the offense.*

Maj. Op. at 549 (emphasis added). Accordingly, the district court must examine "the elements of the crime and the surrounding conduct" to determine whether there was actual force *or a reasonable perception of a threat of force.*

In their concurrences, Judge Stapleton and Judge McKee offer different approaches. Following conviction of a crime involving threats of violence that were not executed, Judge Stapleton would have the district court look to the underlying criminal statute and the relevant section of Chapter 2 of the Guidelines. If the district court could discern from these texts an intent to award lighter sentences to defendants who were unlikely to carry out their threats of violence, Judge Stapleton would allow a defendant who appears unlikely to have carried out a threat of violence to be eligible for a downward departure under § 5K2.13. Judge McKee offers yet another approach to defining "non-violent offense." In his concurrence, Judge McKee advocates a totality of the circumstances test, in which a district court would be required to conduct an individualized inquiry into the specifics of the defendant's conduct to determine whether it constituted a "non-violent offense."

As I see it, our court's inability to agree on a definition of "non-violent offense" in § 5K2.13 illustrates the wisdom of *Rosen.* By utilizing § 4B1.2(a), *Rosen* harnessed the Sentencing Commission's efforts to delineate the boundaries between violent and non-violent conduct. The Commission produced a clear rule. When linked to § 5K2.13 by *Rosen,* the result was simple and straightforward guidance that produced sensible results: defendants convicted of offenses involving the use, attempted use, or threatened use of physical force against a person, or whose behavior presented a serious potential risk of physical injury to others, were ineligible for a reduced sentence due to diminished capacity. By rejecting *Rosen,* our court has created the need to fashion a standard that at best can only replicate the efforts of the Commission codified at § 4B1.2(a).

I do take some solace in the fact that the majority's new standard for evaluating departures appears to do just that. Indeed, it seems that the majority has gone out of its way to reject *Rosen* in theory but has embraced it in fact. Looking at the majority's new definition of "non-violent offense," I am hard pressed to think of a case in which the definition would produce a result different from *Rosen:* that is, when a defendant's action would not involve "actual force, threat of force, or intimidation, the latter two measured under a reasonable person standard," but nonetheless would qualify as a "crime of violence" according to USSG § 4B1.2(a).

The court's attempt to conjure up such an example appears in part IIID of the majority's opinion. There, the court imagines extortion by a public official in violation of the Hobbs Act. In order to come within the court's new standard, a public official with a diminished mental capacity not the result of voluntary intake of alcohol or drugs, acting under color of right, would have to extort funds in violation of the Hobbs Act in a way that did not involve a threat of force, as judged by a reasonable person. In such a case, the court hypothesizes, that official would be eligible for a § 5K2.13 departure under the court's new standard but not under *Rosen.*

I have never heard of such a prosecution. Nor have I been able to locate any published reports of one. Indeed, as the dissent notes, it is not even clear that the majority's rule would produce a different result than *Rosen* given such a set of facts. *See* Dissenting Op. at n. 2. Thus, it appears that the majority has rejected *Rosen* in theory but not in substance: it has fashioned from first principles a new rule that appears to mirror *Rosen* in every set of facts that has been known to arise. This being so, I see no reason to

abandon our *Rosen* rule, with which five other circuits have agreed.

BECKER, Chief Circuit Judge,
Dissenting.

I join in Parts I, II, and IIIA, B, & C of the majority opinion, which overrule *United States v. Rosen*, 896 F.2d 789 (3d Cir.1990), and hold that *Rosen*'s determination that "non-violent offense" as used in U.S.S.G. § 5K2.13 should be controlled by the definition of "crime of violence" used elsewhere in the Sentencing Guidelines was incorrect. Judge Scirica's analysis in these segments of his opinion is not only sound but itself clearly demonstrates why the only appropriate and logical course is to permit the district courts to consider *all* the facts and circumstances surrounding the commission of a crime when deciding whether that crime qualifies as a non-violent offense under § 5K2.13.

In Part IIID, however, the court holds that (and attempts to explain why) we should preclude sentencing judges from granting § 5K2.13 departures in "traditional" bank robbery cases.[1] After invoking the Sentencing Reform Act, 18 U.S.C. § 3553, and exploring the terms of the bank robbery statute, 18 U.S.C. § 2113(a), the court defines "non-violent offense" as those offenses "which do not involve a reasonable perception that force against persons may be used in committing the offense." Op. at 549. The court also states that:

> It would seem, therefore, that with bank robbery convictions under the first paragraph of 18 U.S.C. § 2113(a), a defendant could not qualify for a departure under USSG § 5K2.13 as presently written .... [i]f the elements of the crime require a finding of violent conduct, then a valid conviction could hardly permit a sentence based on a finding of non-violent conduct.

Id. at 548, 549.

I do not believe that there any persuasive reasons to support the categorical exclusion from § 5K2.13 of offense conduct that the analysis in the first segments of Part III would have otherwise left to fact specific

consideration by the sentencing judge. That is because, as those circuits that have already rejected the *Rosen* approach have concluded, the policies behind the departure provisions are distinct from (and often in tension with) the career offender and substantive offense guidelines, and that it accordingly does not make sense to assess whether an offense is "nonviolent" based on the statutory elements of the crime. Unlike the majority, I would follow that logic to its conclusion. That logic, I note, is buttressed by Judge McKee's and Judge Garth's concurring opinions.

## I

Section 5K2.13 of the Guidelines is a policy statement authorizing sentencing judges to downwardly depart in circumstances when the offender is found to have been "suffering from significantly reduced mental capacity not resulting from voluntary use of drugs or other intoxicants." Section 5K2.13 is a guided departure, one that is thus "encouraged." *See Koon v. United States*, 518 U.S. 81, 94–96, 116 S.Ct. 2035, 2045, 135 L.Ed.2d 392 (1996). Although a § 5K2.13 departure depends upon a judgment as to the extent to which reduced mental capacity contributed to the commission of the offense, a departure is optional, and elements of discretion are plainly present.

The critical limitation on the ability of the sentencing judge to grant a § 5K2.13 departure is that the defendant must have committed a "non-violent offense." This term is not, as the majority notes, defined anywhere in the Guidelines. In *Rosen*, we adopted a definition based on "crime of violence," a term of art used in § 4B1.1, the career offender provision, and defined in § 4B1.2. Unlike § 5K2.13, which permits sentencing judges to exercise leniency in appropriate circumstances, § 4B1.1 mandates that a certain class of recidivist offenders receive the harshest sentence possible under the circumstances by ratcheting up both the criminal history and base offense levels.

---

1. I adopt Judge Stapleton's reference to "traditional" bank robbery as that conduct proscribed

by the first paragraph of 18 U.S.C. § 2113(a). *See* Concurr. Op. (Stapleton) at 548.

### A

The effect of *Rosen* was that, by applying the "crime of violence" standard to the "non-violent offense" analysis, the sentencing judge would be bound by the statutory elements of the offense in determining whether the crime was "nonviolent." This is because a "crime of violence" is defined as an offense that "has an element the use, attempted use, or threatened use of physical force against the person of another." U.S.S.G. § 4B1.2; *see also United States v. Poff*, 926 F.2d 588, 594 (7th Cir.1991) (en banc) (Easterbrook, J., dissenting) ("[W]hether a crime is one 'of violence' depends on its elements and not on the defendant's conduct."). What *actually happened* is not relevant; the court need only look to the elements of the offense of conviction. Accordingly, since the crime of bank robbery is defined to include force or intimidation, *see* 18 U.S.C. § 2113(a), it could *never* be found to be a non-violent offense under the *Rosen* construction.[2]

The majority rejects *Rosen* in favor of the contrary view expressed in *United States v. Weddle*, 30 F.3d 532, 540 (4th Cir.1994), *United States v. Chatman*, 986 F.2d 1446 (D.C.Cir.1993), and in Judge Easterbrook's noted dissent in *Poff*. These cases demonstrate why we must necessarily examine the facts of the offense to determine whether "significantly reduced mental capacity" could be a ground for lenience at sentencing. As Judge Edwards summarized in *Chatman*:

> [T]he point of section 5K2.13 is to treat with lenity those individuals whose "reduced mental capacity" contributed to the commission of a crime. Such lenity is appropriate because, as Judge Easterbrook points out, two of the primary rationales for punishing an individual by incarceration—desert and deterrence—lose some of their relevance when applied to those with reduced mental capacity. As to desert, "[p]ersons who find it difficult to control their conduct do not—considerations of dangerousness to one side—deserve as much punishment as those who act maliciously or for gain." *Poff*, 926 F.2d

at 595 (Easterbrook, J. dissenting). Further, "[b]ecause legal sanctions are less effective with persons suffering from mental abnormalities, a system of punishment based on deterrence also curtails its sanction." *Id.* ...

[W]hen an individual with "significantly reduced mental capacity" does not pose a danger to the public, and thus does not need to be incapacitated, that individual is eligible for a downward departure.

Considered in this context, the term "non-violent offense" in section 5K2.13 refers to those offenses that, in the act, reveal that a defendant is not dangerous, and therefore need not be incapacitated for the period of time the Guidelines would otherwise recommend.... A determination regarding the dangerousness of a defendant, as manifested in the particular details of a single crime that he or she has committed, is best reached through a fact-specific investigation.

*Chatman*, 986 F.2d at 1452 (internal citations omitted). The majority also recognizes this policy foundation, finding that U.S.S.G. § 5K2.13 "encourages more lenient treatment for persons *who are not actually dangerous* but whose reduced mental capacity contributed to the commission of a crime." *See* Op. at 546 (emphasis added).

The policy rationale discussed in *Chatman*, in conjunction with the discretionary nature of § 5K2.13 discussed *supra*, counsels that sentencing judges must be given the ability to examine the facts of the offense to determine whether a diminished capacity departure is appropriate. To that end, *Weddle*, *Chatman*, and the *Poff* dissent all reject the *Rosen* approach in favor of a factspecific inquiry. *See Chatman*, 986 F.2d at 1452 ("We therefore believe that a District Court, when deciding whether a particular crime qualifies as a 'non-violent offense,' should consider all the facts and circumstances surrounding the commission of the crime."); *Weddle*, 30 F.3d at 540 (agreeing with the *Chatman* fact-specific approach); *Poff*, 926 F.2d at 595 (Easterbrook, J., dissenting)

---

**2.** The majority concedes as much. *See* Op. at 541 ("If 'non-violent' offense in USSG § 5K2.13 is defined by reference to the term 'crime of violence' in USSG § 4B1.2 and its commentary, then bank robbery would never qualify as a 'non-violent' offense.").

(concluding that "non-violent offense" refers to "crimes that in the event did not entail violence."). Thus, the essential distinction between *Chatman* and *Rosen* is whether the statutory definition of the crime or the facts of the offense will be outcome determinative.[3]

Yet, while the majority ostensibly rejects *Rosen* and claims to find the arguments in *Chatman, Weddle,* and the *Poff* dissent "convincing," *see* Op. at 546, it does not fully adopt the fact-based inquiry necessary to its own position. Instead, the majority posits that the district court should "look at" the facts of the offense, but should do so "within the context of the Sentencing Reform Act and the underlying statute defining criminal culpability." *See* id. at 547. It then directs courts to "assess the seriousness of the offense" to determine whether a departure is warranted by looking "to the elements of the crime and the surrounding conduct." Id. at 548. And while the majority holds that "non-violent offense" should be defined based on the "reasonable perception that force against persons may be used"—which sounds more like a fact specific inquiry—it concludes that:

> If the elements of the crime require a finding of violent conduct, then a valid conviction could hardly permit a sentence based on a finding of non-violent conduct. So long as the bank robbery victim has been threatened with harm, and is seen to have been threatened under an objective standard (reasonable person), the defendant cannot be found to have acted in a nonviolent manner.

Id. at 549.

Since the applicable provision of 18 U.S.C. § 2113(a) has as a statutory element actual or threatened force (the latter measured under an objective standard), by definition an offender convicted of traditional bank robbery could never be found to have committed a "non-violent" offense. Thus, under the majority's construction of *Chatman,* Muhammad Askari could not qualify for a departure under § 5K2.13 *regardless* of the factual circumstances underlying his offense. To that end, the majority's proposed "reasonable perception" standard does not save its opinion from being analytically identical to *Rosen.* As Judge McKee explains in his concurring opinion, under the majority's reasoning "once a sentencing court concludes that the elements of a crime include violence or intimidation, a defendant is no longer eligible for the fact-specific, case by case inquiry that would otherwise govern a departure ... under § 5K2.13." Concurr. Op. (McKee) at 554. In other words, in such a circumstance the majority directs us not to consider whether the facts of the case constitute a real expression or threat of violence, but whether the crime itself is "of violence." This restricts the meaning of "non-violent offense" by "the very definition [the majority] holds does not apply." *See* Concurr. Op. (McKee) at 554.

I fail to see how this approach, which appears to credit Judge Easterbrook's reasoning, is substantially different from a straightforward application of *Rosen* or the majority view in *Poff.* As Judge Garth aptly opines in his concurring opinion, the majority has "gone out of its way to reject *Rosen* in theory but has embraced it in fact." *See* Concurr. Op. (Garth) at 557. I observe that the majority has properly rejected *Rosen* in theory, but has gone out of its way to embrace it in fact.

## B

It is important that we pause and recognize the significance of what the majority

---

**3.** I note that the circuit split on the question presently before us has caught the attention of the U.S. Sentencing Commission, which has recently proposed four alternative amendments to § 5K2.13. *See* 62 Crim. L. Rep.2051, 2078–79 (Jan. 21, 1998). Option one corresponds to the *Rosen—Poff* majority view. Option two corresponds to the *Chatman* fact-intensive view. Option three, a variation on the *Chatman* view, "defines the scope of the departure to exclude cases that involve actual violence or a serious threat of violence." *Id.* at 2078. Finally, option four broadens the scope of the departure by eliminating the "non-violent offense" limitation altogether. *See id.* It is interesting that the Commission, obviously influenced by the force of Judge Easterbrook's *Poff* dissent, which it explicitly references, appears to be in doubt over the best course to take. Unlike many of the other proposals for amendment it has made in the past, the Commission proposes four distinct options rather than taking a definite stance on this issue.

holds today. As the majority correctly notes, one element of the applicable bank robbery statute is that the offender takes property either "by force and violence" or "by intimidation." See Op. at 541.

As discussed, it is this element of the offense that seals Muhammad Askari's fate. However, as the majority also notes, to prove "intimidation," the government need only show that an "ordinary person in the teller's position reasonably could infer a threat of bodily harm from the defendant's acts." Id. (citing United States v. Woodrup, 86 F.3d 359, 363 (4th Cir.), cert. denied, —— U.S. ——, 117 S.Ct. 332, 136 L.Ed.2d 245 (1996).) This means that a defendant whose diminished mental capacity at the time of the offense is beyond cavil could be precluded from a § 5K2.13 departure despite a record that clearly demonstrates that (a) there was no actual violence; (b) there was no real chance of violence being carried out; and (c) no one in the bank at the time of the robbery actually felt threatened by the defendant. This result cannot be consistent with the desert and deterrence rationales discussed supra and impliedly embraced by the majority.[4]

In contrast, to be consistent with its reasoning in Part IIIC, the majority should have modeled its result in Part IIID on Chatman. The facts of Chatman are just like those presently before us. The unarmed defendant walked into a bank, passed the teller a note demanding money, and threatened violence otherwise. The defendant left the bank without incident and was captured by the police soon thereafter. Since it was unclear from the record whether the district court had assessed the specific facts of the case and exercised its discretion to depart, or whether it had categorically rejected the § 5K2.13 departure based on the statutory definition of bank robbery, the D.C. Circuit remanded for a resentencing. See Chatman, 986 F.2d at 1454. The same result should obtain here. As in Chatman, the district court rejected the § 5K2.13 departure not on the facts, but because it believed (correctly, as things have turned out) that it was precluded from departing based on the elements of the crime. But as Judge McKee states, once we have rejected Rosen, "we need no longer tether our § 5K2.13 analysis to the definition in § 4B1.2 that we have just rejected." Concurr. Op. (McKee) at 554.[5]

4. The majority attempts in Part IIID of its opinion to suggest a set of circumstances in which an offender convicted of bank robbery still could qualify for a § 5K2.13 departure. In the majority's hypothetical, a public official could commit bank robbery by extortion in violation of the Hobbs Act, 18 U.S.C. § 1951(b)(2) without force or the threat of force. See Op. at 547–549. As Judge Garth suggests in his concurring opinion, this is a somewhat far-fetched set of facts, and is not particularly helpful in deciding whether the rule the majority fashions today is distinguishable from Rosen. I would also add that the majority's example, on its own facts, although styled as a "bank robbery" would appear to involve instead a prosecution under the Hobbs Act—which does not have as a necessary element the use of force or the threat of force. See United States v. Addonizio, 451 F.2d 49, 72 (3d Cir.1972) (indicating that Hobbs Act violation can be based on fear of economic loss). In that case, the majority's hypothetical defendant could be eligible for a § 5K2.13 departure even under Rosen. If, on the other hand, the majority's example would entail a prosecution under 18 U.S.C. § 2113(a), by the terms of the majority's own opinion a diminished capacity departure would be precluded. See Op. at 548 ("It would seem, therefore, that with bank robbery convictions under the first paragraph of 18 U.S.C. § 2113(a) [including extortionate acts], a defendant could

not qualify for a departure under USSG § 5K2.13 as presently written.").

In order to distinguish itself from Rosen, the majority would need to generate a hypothetical under the first paragraph of 18 U.S.C. § 2113(a) that would not foreclose a diminished capacity departure. This the majority has not done. See also Concurr. Op. (Stapleton) at n. 1 ("While it has been suggested that a public official may be able to commit bank robbery by "extorting" bank funds without a threat of violence, I would not regard this as traditional bank robbery and I would take no position on the application of § 5K2.13 in such a case.").

5. Both the majority in Part IIIE and Judge McKee's concurrence conclude that we should also affirm the district court's denial of a departure pursuant to § 5K2.13 because Askari's criminal history suggests a need to protect the public. While it is true that to be eligible for a diminished capacity departure, § 5K2.13 requires that "a defendant's criminal history does not indicate a need for incarceration to protect the public," and while the district court found that Askari has a long history of crime, the district court did not expressly make a finding about the need for incarceration in this case. I believe that that determination should be made by the district court in the first instance.

## II

Judge Stapleton, writing separately, also agrees that the definition of "non-violent offense" used in § 5K2.13 should not be controlled by the definition of "crime of violence" used in the career offender provision, § 4B1.1. However, like the majority, he concludes that a downward departure is not warranted in traditional bank robbery cases. Although Judge Stapleton's rationale differs somewhat from the majority's, I believe that it still comes up short.

Judge Stapleton's reasoning can be summarized as follows. First, he rejects Judge Easterbrook's view that the findings of the jury at the guilt phase with respect to the defendant's use of violence or threats are essentially irrelevant at the departure phase. See Concurr. Op. (Stapleton) at 550. Judge Stapleton believes, like the majority, that if a conviction for bank robbery necessarily entails a jury finding that the defendant's conduct was, at least, reasonably perceived as involving a threat of violence, this finding should preclude characterization of the offense as "non-violent" for § 5K2.13 purposes. See id. at 547, 551. The difference between this view and Rosen, according to Judge Stapleton, is that while Rosen mandates that the elements of the offense control the outcome in all cases, under the Stapleton view the elements do not always control, but rather the "findings necessarily implicit in a conviction may preclude" characterization of the offense as "non-violent." See id. at 551.

Accordingly, Judge Stapleton also rejects the Chatman view that whenever a § 5K2.13 motion is made in a bank robbery case involving unrealized violence, the sentencing court should have the opportunity to make an independent determination whether or not the threat "was a serious one that would have been acted on had events unfolded differently." See id. at 552.[6] His rejection of the need for such factual findings is premised on a belief that the Sentencing Commission intended the Guidelines to follow the "traditional view" that crimes involving violence and crimes involving only threats of violence are regarded as being of equal seriousness. Based on an examination of the text of both the robbery guideline and the robbery statute, he finds no distinction between realized violence and unrealized threats. Accordingly, Judge Stapleton concludes that the Commission did not intend to authorize downward departures in traditional bank robbery cases involving only unrealized threats. See id. at 551. Hence, Judge Stapleton is of the view that an offense involving an unrealized threat could never be "non-violent."

I disagree with this analysis for two reasons. First, I am not persuaded that Judge Stapleton's reliance on "the findings necessarily implicit in a conviction" is analytically distinguishable from the Rosen approach. The findings that are necessary to a conviction for a given offense will always be equivalent to the statutory elements of that offense—that is, to say that implicit in a bank robbery conviction is a jury finding that there was a reasonable inference of a threat of bodily harm is no different from saying that the bank robbery statute requires the government to prove that the victims reasonably felt threatened. Thus, it makes no sense to me to hold that the sentencing court should "look to the underlying facts," see Concurr. Op. (Stapleton) at 551, while simultaneously holding that a departure could be precluded by "implicit" facts—i.e. the elements of—the conviction. I reiterate the point made by both Judges McKee and Garth that there is no difference between the Rosen "crime of violence" approach and an approach by which the decision to depart is per se precluded by the statutory elements of the offense. See Concurr. Op. (McKee) at 553; Concurr. Op. (Garth) at 556–558. Judge Stapleton's first conclusion cannot be consistent with a rejection of Rosen.

---

**6.** The Chatman court disagreed with the Poff dissent to the extent that Judge Easterbrook's opinion could be read to suggest that any crime that does not actually involve physical violence is a "non-violent offense." See Chatman, 986 F.2d at 1454. The court found instead that some offenses that did not actually result in violence may suggest that the defendant is "exceedingly dangerous" and needs to be incapacitated. See id. The court described such offenses as those which "involved a real and serious threat of violence," and included as an example assault with a deadly weapon. See id. This determination, however, was left to the district court.

Second, Judge Stapleton's conclusion that the Commission has adopted the "traditional view" that threats and actual violence should be treated the same in the departure context is equally problematic. As the majority's analysis of *Poff, Chatman,* and *Weddle* amply indicates, a major reason why we have rejected the *Rosen* analysis is that the policy goals driving the departure provisions are significantly different from the policy goals motivating the other portions of the Guidelines. *See* Op. at 545–46, 546–47; *see also Chatman,* 986 F.2d at 1452. Thus, while it may make good policy sense to treat bank robbery offenders who use violence the same as those who only threaten violence for purposes of computing the applicable base offense level, different policy goals are implicated when it comes to the departure decision, and in that context it does not necessarily make sense to treat empty threats and actual violence as *per se* the same.

Furthermore, as Judge McKee explains in his concurring opinion, the "Sentencing Reform Act and the resulting Sentencing Guidelines have altered the relationship between the offense of conviction, and the criminal sanction that follows." Concurr. Op. (McKee) at 554. To use Guidelines vocabulary, the "heartland" of the offense sets the presumptive sanction range by way of the base offense level. In the bank robbery context, that heartland is defined by the mere prospect of violence. *See Poff,* 926 F.2d at 594 (Easterbrook, J., dissenting). Thus, the presumptive sanction is the same whether the offense involved actual violence or the threat of violence. Section 5K2.13, however, is concerned with whether the offense conduct is indicative of a need for the standard incapacitation entailed by a given offense or whether the conduct is more indicative of a mental illness, and thus society has a lesser need to incapacitate. *See Chatman,* 986 F.2d at 1452 (discussing incapacitation rationale). Thus, when "things turn out better than they might" and violence does not actually occur, a departure becomes permis-

sible. *Poff,* 926 F.2d at 594 (Easterbrook, J., dissenting). In that light, whether the offender was actually violent or posed a *real* threat of violence, or whether he presented a threat that was unlikely to have been realized, is a central and necessary factual distinction in the departure context. Thus, it does not necessarily follow that because the robbery offense guideline does not distinguish between realized and unrealized violence that the departure provisions should similarly not make such a distinction.

Moreover, it is not even obvious that the robbery offense guideline does not fully distinguish between "situations in which violence actually occurs and situations in which it is threatened but the threat is not realized." Concurr. Op. (Stapleton) at 552. Judge Stapleton is correct that § 2B3.1, the robbery offense guideline, does not provide for a specific base level enhancement for violence *per se.* However, § 2B3.1(b)(3) mandates a graduated offense level increase if the victim of the robbery sustained a bodily injury.[7] I recognize that there can be crimes where violent conduct occurs but does not result in bodily injury, and thus this enhancement does not squarely refute Judge Stapleton's argument. *See United States v. Harris,* 44 F.3d 1206, 1218 (3d Cir.1995) (finding that there will be crimes where the offender will use mace but will not cause bodily injury to victims). At the same time, it seems plausible to read into this provision an intent of the Commission to treat serious threats the same as violence only when that violence does not result in injury. Since threats by themselves cannot cause bodily injuries, *see United States v. Sawyer,* 115 F.3d 857, 859 (11th Cir.1997) (holding that psychological injury by itself cannot support an enhancement under § 2B3.1(b)(3)), the Commission clearly intended to treat legitimate threats and substantial violence differently. Perhaps, then, the Commission did not adopt

---

7. Section 2B3.1(b)(3) provides, in part:

   If any victim sustained bodily injury, increase the offense level according to the seriousness of the injury:

| Degree of Bodily Injury | Increase in Level |
|---|---|
| (A) Bodily Injury | add 2 |
| (B) Serious Bodily Injury | add 4 |
| (C) Permanent or Life–Threatening Bodily Injury | add 6 |

Judge Stapleton's "traditional view" wholesale after all.[8]

In sum, I would follow the principles advanced in *Chatman, Weddle* and the *Poff* dissent. Even if there is a reasonable perception of a threat by the bank teller that justifies a conviction and a base offense level that is the same as if the offender had used actual violence, the policy goals underlying Chapter Five of the Guidelines are different from the policies underlying the substantive offense provisions, and thus the jury's factual determinations should not necessarily preclude a departure.

## III

The improvidence of the majority view is demonstrated by a recent highly publicized incident in the Philadelphia area. In December of 1997, in a drama resembling the one currently before us, the mayor of Darby Borough, Pennsylvania, a beloved and respected long-time member of the community, walked into a local bank in broad daylight and told a teller "This is a robbery. I have a bomb on me." *See* Lisa Sandberg, *Darby Mayor Held in Bank Heist,* Philadelphia Inquirer, Dec. 28, 1997, at B5. Apparently the mayor walked out with $1,500, but surrendered to authorities about one half-hour later. *See id.* According to the police investigating the crime, the mayor did not actually possess a bomb. *See id.* Friends and colleagues believe that his actions were the product of chronic depression related to personal and financial troubles. *See* Raphael Lewis & Lisa Sandberg, *Depression Tied to Bank Robbery,* Philadelphia Inquirer, Dec. 30, 1997, at B1, B6.

If this were a federal case (it is not and will not be),[9] a district court would have no grounds under the majority's opinion to depart downwards on grounds of diminished capacity. More specifically, it would have no grounds to depart even if it found beyond

cavil that the defendant's actions were prompted by a deep psychological disturbance and that there was no real threat of violence. In my view that makes no sense.

For all the foregoing reasons, I respectfully dissent. Judge Nygaard and Judge Roth join in this dissent.

---

8. Even accepting that the Commission did not intend to distinguish between violent offenses and offenses involving a real threat to violence in the departure context, that does not change the fact that the sentencing court needs to examine the offense conduct to determine if the threat was real enough to justify being treated like actual violence in the departure context.

9. I am informed by the United States Attorney that the mayor is being prosecuted in state court, and that he will not be prosecuted in federal court.